Case Numbers 21, 41, 32, and 22, 3306, Karla Howell v. NaphCare Inc, et al. Argument not to exceed 15 minutes per side. Ms. Raine, you may proceed for the appellate. Good morning. Good morning, Your Honors, and may it please the Court. Meg Haram for Plaintiff Appellant Karla Howell, and I'd like to reserve four minutes for rebuttal. When Cornelius Howell experienced a medical emergency that caused him severe pain and left him unable to walk or stand, every one of these defendants failed him. He was so obviously unwell that even a layperson asked if he should go to the hospital, but Nurse Jordan relegated him to a restraint chair and did not check on him again. And once he was in that chair, the only way he could get help was if someone checked on him. Can we start with Nurse Jordan? So, you know, this is a hard case. I think Judge Cole wrote a really thoughtful opinion, but it's still a hard case. I certainly would acknowledge that. So with Nurse Jordan, I mean, one way the point is put is, well, you're not allowed to just have any diagnosis, and that proves lack of deliberate indifference, and I quite agree with that. But I didn't think her diagnosis was off the charts crazy. They certainly get plenty of people in the jail suffering from detox-type symptoms, which is what would lead to a psychiatric episode. She knows he has sickle cells. It's not as if she doesn't know about the sickle cells. So she clearly makes a mistake, but that's the whole question. Was it a negligent mistake or a reckless mistake? And since her diagnosis that happens to be wrong seems to be thoughtful, how do you show that's reckless? Well, Your Honor, to be clear, it's not our position that her misdiagnosis could be the basis alone for deliberate indifference. Rather, our position is that she was faced with very serious physical symptoms that are completely inconsistent with a psych issue, so namely the numb legs. So numb legs is not, that's inconsistent with detoxing. Well, Your Honor, Nurse Jordan Detoxing, that's why she doesn't want to give more drugs, right? He wants oxycodone for the pain for the sickle cell, right? I mean, you can understand the tension there. A nurse might say, yes, sure you do, because you're detoxing and it's very painful. Well, Your Honor, when asked, Nurse Jordan specifically said that she sent him to psych because his eyes were large, he was yelling, and he had been in a fight. She did not reference the legs or the severe pain or the low blood pressure, three very physical medical symptoms that would require some sort of referral to medical care rather than just psychiatric care. And I think, just to the point about misdiagnosis, this Court's precedents are quite clear, and Taylor and Lamar specifically, that when a medical professional is faced with serious physical symptoms, they cannot simply do nothing to address them, even if they don't connect those symptoms to the correct diagnosis. So in Taylor, for instance, the District Court did grant rule in favor of a nurse when she failed to diagnose that a tumor caused that person's symptoms. He was also in pain and couldn't move his legs. But this Court reversed, and it said, you know, it didn't talk about that misdiagnosis at all, and it said that just being faced with those symptoms, severe pain and immobile legs, was enough to know that she should have known of a risk of harm, she should have done something to address that. So we're not saying Nurse Jordan here necessarily had to diagnose him or say that those symptoms were coming from sickle cell, but where those symptoms were very inconsistent with a psychiatric issue, she should have taken... But I still don't understand the inconsistency point. They're completely consistent to me with detoxing. Okay, so someone's detoxing, they want oxycodone. They will start saying whatever it is that will help them get the oxycodone. And that's why the restraint share makes a lot of sense. Well, Your Honor, Nurse Jordan, when asked why she sent him to psych, didn't mention those symptoms, and... But that's not proof of recklessness. Well, she also testified that she believed that he was in pain and that she did not think he was faking those symptoms. You know, those sites are Record 76 at 993... Doesn't it make sense if you think someone's got an addiction issue to be skeptical about giving them more oxycodone? Well, Your Honor, I think that's an inference that the jury could draw, but I think the evidence here would also permit a jury to reach the conclusion that Nurse Jordan was faced with physical symptoms and that she either should know or did know that those were indicative of some sort of medical issue rather than a psychiatric issue. And on that note, you know, I would point this court to Sowers where the nurse there said that she did not think the person before her was experiencing a diabetes-related complication. And the court said a jury could disbelieve that based on all of the evidence suggesting otherwise. And here I think there are a couple very important pieces of evidence that would allow a jury to reach that same conclusion. You know, as you noted, Chief Judge, Nurse Jordan knew he had sickle cell. She knew he was in pain and had numb legs. She specifically testified that she knew pain and numb legs were symptoms of a sickle cell-related complication. She had previously treated sickle cell patients. So she had all of this knowledge. And from that, a jury could either conclude, one, that she knew he had some sort of physical issue, not a psychiatric issue, did not respond appropriately, or two, under Sowers, that she actually did know this was a sickle cell-related complication and still did not respond appropriately. And a jury may see these facts and reach the conclusion you've reached about... Well, how about the officers? And, you know, again, you have the... Officers aren't medically trained, so it's usually negligence, not reckless, if they rely on a misdiagnosis. Sure. So, Your Honor, I think Smith and Spears are very instructive here. So in both of those cases, a doctor had previously signed off on the patient's condition, and Smith, the doctor, actually told the officers, you know, this person is on good medicine. A nurse is going to see him tomorrow. Two officers were still found deliberately indifferent in that case, Vanderpool and Craig, for monitoring failures that happened after that doctor signed off. You know, one of those officers, despite knowing that the doctor had said that, did not check on this person for 40 minutes, and she testified that when she did check, she looked through the window. And this court said that a jury could find that inadequate monitoring and that a jury could find deliberate indifference on that basis. Is there an officer case where we find it's a tribal issue of fact for a jury where the officer relies on a medical employee's diagnosis, and the span between the reliance and the death is a pretty tight window? You know, here, no more than four hours, arguably less. Is there one with that kind of span? Well, Your Honor, in Smith, the doctor signed off in the late night, and then the monitoring failures happened the next morning, so that's also a fairly short time period. And I think the case law doesn't have sort of a hard and fast rule about how long you can rely, but where there are such serious and obvious risks, right, Officer Irwin saw Mr. Howell slumped over in the medical sally court. He knew he was in pain and had numb legs. He actually also said that he did not think those symptoms were a form of protest or resistance. You know, he, despite seeing those very serious symptoms, effectively ignored Mr. Howell for hours. And so, you know, in that situation, I think we are very close to the Smith and Spears case law that says, you know, even if you have a doctor saying something, when you are aware that there is a potential risk of harm here, you cannot engage in inadequate monitoring. So to take Spears, then, in that case, two officers were found, a jury could find them to be deliberately indifferent. That's what this court said. One of them, like the officers here, said he just looked through the plexiglass into the cell and saw someone that he said he thought was sleeping. This court said when he was aware that there was a potential risk of harm, he should have tried to engage that person, he should have gone in, he should have called medical, and he should have done something when he was aware that there was a potential risk of harm. So the officers in this case are in that exact same position. They, of course, skipped many checks and then fabricated and then lied over and over to cover that up. And even the checks they did do were completely inadequate. They did not, you know, go, they didn't do anything to follow up on someone who could have been sleeping but could have been dying, you know, in the process of dying, as was the case here. Do you see all the officers in the same category or are there distinctions between Officer Irwin and Officer Kalini, I think is the pronunciation? Your Honor, I think they are in different positions from each other because their awareness of the risk of harm came from different sources. So Officer Irwin, as I noted earlier, was well aware of the medical crisis that Mr. Howell was experiencing. He heard the moaning and the yelling and he knew about the pain. He transported him in the restraint chair when he was continuing to engage in those behaviors. So what actions of Kalani took it from negligence over into a claim? Right, well, so, Your Honor, Kalini was aware of a risk of harm that came from being in the restraint chair. And so he testified that he was aware that when someone is in a restraint chair there could be medical problems and that the frequent checks were important for that reason. And, of course, one of the risks inherent to a restraint chair is that you are completely at the mercy of the officers doing the checks. You know, you can't go bang on the cell door to ask for help. You don't have a cellmate that can get that help for you. You are completely dependent on the officers. And I think Officer Kalini's testimony reflects an understanding of that risk of harm and still he didn't do anything. He didn't effectively monitor Mr. Howell for hours. So I do think they're in a different position but I think there's sufficient evidence for a jury to find both of them deliberately despite those different sources of knowledge. And what about Nurse Arthur? Is she not distinct from Jordan? I think she is as well, Your Honor. She didn't have the same exposure as Nurse Jordan did. But still, she didn't go in the cell. You know, she didn't take his vitals. She didn't call a doctor despite saying she knew that it was necessary to do that. So, again, I think there is sufficient evidence there on her as well. Though I do think Nurse Jordan had a lot more knowledge as to the risk of harm and acted deliberately and differently in two different ways by not sending him to the hospital and then ignoring him for four hours after. Your Honor, I see my time has expired. Thank you. Thank you. Good morning. Good morning. May it please the Court, Robert Hynoski for the NAF care appellees. After extensive briefing, extensive discovery, extended oral arguments, Judge Cole issued, in our opinion, a very thoughtful and well-reasoned decision. He then issued a second decision after a 60B motion was filed. And we would respectfully submit that Judge Cole properly granted summary judgment to all parties in this case, specifically the NAF care parties, regardless of which standard is applied by this Court. NAF care parties or the nurses? The two nurses and NAF care inquest is also named, Your Honor. I got it. Okay. And certainly Nurse Jordan and Nurse Arthur have to be evaluated separately under 1983. Of course, there is no vicarious liability. I don't think there is even an argument of a Monell claim in this case. Well, as to those clients, you make an extended argument that Brawner is non-binding dicta. But that issue has been resolved now. Is that not correct in Green? Excuse me? That issue, the claim that Brawner is non-binding dicta, has been resolved by the opinion in Green. Isn't that correct? The Green statement that we are bound by Brawner, right? We would submit that until there is an en banc decision addressing that standard, that it is not binding. However, in this case, I don't think that it's pertinent. I think under either standard. Did it make a difference below? It did not make a difference below, Your Honor. What did Judge Cole say about this? He said that under either standard, there is not a tribal issue of fact as to deliberate indifference under historical precedent with objective subjective components or under a recklessness standard or an objectively unreasonable standard. Well, you might as well argue it under Brawner then. Sure. It certainly hurts you below, so you might as well argue it that way here. And I agree. We certainly briefed that issue, but we do not think it's pertinent. We think Judge Cole, under the 60B decision, clarified that correctly. The key pertinent facts of this case is that Mr. Howell was an inmate for a week at the Hamilton County Justice Center. He was assessed at booking. He was assessed several times thereafter. So if he had been there a week, why would there still be addiction issues? Why would the nurse think, you know, bad to give him oxycodone if he's, I mean, I'm not an expert. Certainly withdrawal can. It lasts more than a week? Is that the point? Withdrawal protocols, I think typically, or I will submit from my prior experience, can go up to seven to ten days typically. And in this case, it was not stated by the appellant, but Mr. Howell stabbed his inmate. He was acting erratically. He was yelling. He was screaming. He complained of leg and back pain. He had a lifelong history of sickle cell disease. The evidence in the record from his family members who were deposed indicated he knew when he was having a sickle cell crisis. He had been to the hospital in the past. At no point in time did he say, and this is undisputed, that he thought he was having a sickle cell issue. He didn't say that sickle cell was part of the reason he was having pain and needed oxygen? He did not. It's a key omission from him. He refused treatment. His vitals were taken. His blood sugar was taken. He was given glucose tabs that he spit out. He refused hydration. He was just yelling and screaming. The cellmate that he stabbed told Nurse Jordan, who was assessed before him, that all of a sudden he's acting erratically. He's off. Something's not right. He had a history of mental health issues. He had a history of abusing narcotics. Nurse Jordan, in a period of however long he was brought down to medical, 30 minutes plus or minus, looked at his chart, assessed him twice, took his vitals twice, tried to talk to him, had talked to his cellmate, and she believed reasonably that he was having an acute psychiatric issue. Everyone agreed that he was erratic. Everyone agreed it was for his safety, that he'd calm down, that he'd be put into a restraint chair, not for punishment, but to be assessed. He's taken to the psych department, which is where, at that time, inmates that are put in restraint chairs went. He was assessed within an hour by Nurse Arthur, a very experienced nurse. He was still yelling, swearing, combative. She reported that back to Nurse Jordan. All experts in this case agree, including the coroner's office, that it was a sudden, unexpected, unforeseeable death. There had never been a similar incident in this jail ever. My expert in this case, in Record 87-3, specifically stated that a patient with sickle cell disease complaining of severe pain should never be ignored. Isn't that the testimony in this record? But he wasn't ignored. The timeline in this case is so incredibly short. This panel is certainly presented with deliberate indifference cases where there's days that go by. Long enough that observation events that were required to be done by policy were not done. So you think the time during which the observation that was relied on by the defendants in this case and was not done is not indicative of a problem, of a failure of treatment of the sickle cell with the knowledge that medical had of his medical issues? I would respectfully submit that within a very short period of time of Mr. Howell being in an altercation where he stabbed his cellmate, he was immediately brought to medical. He was immediately assessed. There were several nurses there, several correction officers there. Didn't several of those assessments indicate that there were physical problems? There was low blood pressure. There were other physical problems. All indicative of sickle cell crisis, right? The testimony is undisputed. His vitals were stable. He subjectively complained of back and leg pain. Subjective complaints of pain certainly does not give rise to an objectively serious medical need. My understanding of this record is that he showed medical problems, that his vitals were not correct. Perhaps you would need to follow up with the record citation to say that his vitals were all correct because that's not my memory of this. The testimony from Nurse Jordan is that his vitals were normal, stable. The testimony from Plaintiff's only medical expert was that there was nothing about his vital readings that would have indicated any serious medical issue was going on. In fact, Plaintiff's medical expert acknowledged that there was nothing that these nurses could have possibly known was going on with him that was going to lead to a sudden death. Their expert says that he has rhabdomyolysis, which is a condition caused usually by triathletes or people that do extreme physical activity. It doesn't even attribute it to sickle cell disease crisis. Mr. Howell, again, who knew his condition, had dealt with this condition typically just by rest and ibuprofen, never indicated he was having a sickle cell crisis. Counsel, when you say that he never indicated that he had a sickle cell crisis, are you suggesting that he did not say that he had sickle cell? He didn't. It was only known by Nurse Jordan that he had sickle cell because when he was brought into medical and assessed, she went back to the computer system, looked at his chart, and noted that he had sickle cell disease in his history because he had been assessed by a nurse practitioner, I think two days earlier, Nurse Practitioner Pegram, who is not a named defendant, and was put on the chronic care list for sickle cell disease. My time is up. Thank you. You're with the Sheriff's Office? Yes. So you're representing Irwin, Colini, and Hunt? Yes. Good morning. I'm John Welch. I represent what's referred to as the Hamilton County Defendants. It's Sergeant Justin Hunt, Deputies Matthew Colini, Dan Irwin. What do we do with Officer Irwin and his statement that he should have been taken to the hospital? As you know, we understand the point that normally non-medical professionals can rely on medical professionals. We get that point. But you run into trouble if you start to see things that give you reason to have pause about the medical assessment. Yes. Certainly Deputy Irwin was in the sally port with Justin Hunt, and there were two nurses who were fully evaluating Mr. Howell, where, in essence, our position is that the medical ruled out a serious medical need. Then the events happen. Mr. Howell passes away, and then Deputy Irwin gets interviewed. In that interview, he simply discusses that in this medical sally port, the nurses were discussing whether or not to send Mr. Howell to the hospital. So that statement really is made in retrospect after the death. Doesn't he say more than that, though? He doesn't just say that the nurses were discussing whether or not to send him, but that he, in fact, thought that this guy probably needed to go to the hospital. He said he felt at the time as he's bringing, and I think in the context they're bringing him to medical after this fight, and in the context of, in retrospect, he said, yeah, I felt that he needed to go to the hospital. But part of Judge Davis, they brought him to medical really to make that determination. Well, be that as it may, if he had the appreciation that this guy needs medical care, forget about whether it's going to the hospital or whatever it is, he appreciated the risk. Would you agree that that's some evidence of that? He says that he thought that he needed to go to the hospital. I think he appreciated the risk in the sense he needed to be evaluated, for sure. So having appreciated that risk, obviously he's not a medical professional, so he can't render any medical assistance, but the things that he could have done, which would include observing him and monitoring him in a proper fashion, or at least following the policies within the jail, that's what he could have done. Yes. Correct? Correct. But I think in context, what medical does after they evaluated him in the medical sally port, they determined in their judgment he is having a psychiatric issue as opposed to a physiologic issue. But isn't there testimony in this record that Hunt testified that it was determined that he's not going to the hospital, rather, for his safety and for observation, he's going to the restraint chair? Correct. So the expectation, the acknowledgement of the illness and the physical problems and the need for treatment, the nurse then says, we're going to put him into a restraint chair for observation, and then the officers don't observe him. Why is that not problematic for your case? Well, in the context of deliberate indifference, medical ruled out a serious medical need, and in that context, they determined that there's a psychiatric issue, he needs to calm down in the restraint chair. I'll go back. There's no question. How did they rule out a serious medical need? What they said is, we think this is psychiatric, we're going to put him in a restraint chair. Be observed. And observe him. Yes. And then they didn't do that. That's not ruling out a medical issue, particularly to people who have knowledge of his sickle cell illness. That is saying, we're going to keep looking at him and making sure there's nothing wrong. And then they didn't do that. So they determined he didn't need to go to the hospital. Wait. Try to answer the didn't look at them. That's the thing with those sets of questions. Explain either they did look, you're wrong, they didn't look, just answer that question. That's what she wants, that's what I want. Understood. So he goes in the restraint chair, he's taken up to the cell. He is observed initially. Nurse Arthur comes by and sees him in the 610, 620 p.m. time frame. After that, he is observed, not every 10 minutes per policy, no question about it, it's a policy violation, but he was observed, and he appeared to have calmed down. They were supposed to do it every 10 minutes, and they did it roughly every 20? About every 30, 40 minutes. With big gaps, some closer together and some big gaps. That is correct. But they also observed him through a little window, right? They did. They observed him through a window. And one of the observations says, well, he's not yelling anymore, but he's kind of slumped over. Still nothing more done. Why doesn't Green govern this whole case? Green talks about, at a certain point, bare minimum observation ceases to be constitutionally adequate. Why isn't that this case? Well, because I think what happened in the context, he did calm down. He appeared to be sleeping. These complaints that they were observing in the medical sally port ceased to exist. They didn't continue, like in the Green case or the Smith case or the Spears case where the detainee was having delirium tremens, and it continued for hours, if not days. So in the officer's mind, and their understanding, is that when he was ordered to be placed in the restraint chair to calm down, he did, in fact, calm down. They did not observe him per policy. No question about it. But in their observations, he did calm down. And so in their mind, there wasn't a serious – What do the facts show in terms of observation through this window that he, quote, I mean, if you have slumped over versus calm down, I mean, slumped over doesn't sound like you're calmed down and resting. Slumped over sounds like you're in an awkward position, which would not be consistent with resting. They wrote chair on the restraint form, and their testimony was he appeared to be sleeping. Matt Colini later thought that he was slumping over, and then he was looking out the window at some point. But it was only a side view. So they couldn't take a look at his face on. They couldn't see if he was discolored. They couldn't see if he was dead until they finally went in and he was dead. That is correct. That is correct. So they did observe him. Our position is – No, there's a question. There's a question about whether peeking through a plexiglass door is an appropriate observation when you have someone in his condition. And the testimony was that that's all we did. And we did not go in and look at his face. Right? Correct. Or see anything else about his body. Right? Correct. Okay. In our position, I'm out of time. All right. Thank you. We'll hear rebuttal from Ms. Ram. Your Honors, I'd like to start by correcting a few things about the factual record. First, Mr. Howell, when he went to the Sally Port, did tell Nurse Jordan that he had sickle cell. And that's at Record 76, page 1011. What does he say? Does he say, I'm having a crisis? What does he say? What are the words? He says he is complaining of sickle cell. He's complaining of pain and says he has sickle cell. And that's actually Nurse Jordan's deposition testimony where she admits that he said that. And, of course, it's a reasonable inference that if someone comes to you yelling in pain and saying, I have sickle cell, the implication is that has something to do with why they're yelling in pain. Second factual matter I'd like to correct is about the experts in this case. The coroner said that the first reason for the cause of death was that this was a sickle cell crisis. Expert Dr. Steinberg said that he died of a complication from sickle cell, that it would have been more likely than not he would have survived if he had been transferred to a hospital. And as to the point about this being a very quick death, he was put in the chair at 540. We know that he was heard yelling at 606 by Nurse Arthur and the others. So if, you know, the coroner's testimony that this happened within minutes is to be credited, now that time period, he was at least alive 30 minutes later, right? And so a jury could certainly credit Dr. Steinberg's testimony instead, that there was sufficient time here to get him to a hospital if he had been transferred. Third, Your Honor, Judge Stranch, you discussed the abnormal vital signs. He did have an abnormal respiratory rate. The NAF care medical director actually looking at the record said that. That's at page record 69-6 at 447 and 448. But what was the rate and how was it relative to what's abnormal? It was 22, and my understanding is that that is low. Relative, like what's normal? That's what I'm asking. I'm not sure, but this testimony from the NAF care medical director himself noted that that was abnormal. He used the word abnormal. He also had low blood pressure. That's at 69-1 at 242. So there were abnormal vital signs, not to mention the pain and the numb legs, which, again, I think a jury could find are inconsistent with the psychiatric issue. Now, Your Honor, I'd also like to reiterate that as— Help me with abnormal. I mean, you know, it's the rare individual that doesn't have a couple of vital signs that are not normal. I would have thought the question was crisis signs. Well, Your Honor, when abnormal vital signs are coupled with the other range of symptoms here, I think there's certainly enough for a jury to find that the number of physical symptoms, including the abnormal vital signs, were enough to put someone like Nurse Jordan, who had this extensive experience with sickle cell, on notice that she was dealing with either a sickle cell crisis or some sort of physical crisis, where those symptoms are—a jury could find are completely inconsistent with the psych issue, and where she did not actually mention any of those symptoms as being consistent with a psych issue. Your Honor, I'd like to also, with my last minute, just talk briefly about the claim against the county. The county did not train these officers about how to monitor people in restricted— So in those cases, you usually have to show a pattern of problems or something super obvious. So what was the—there's no pattern. So what's the super obvious thing in their training? Well, Your Honor, I think that the obvious thing here is that they were asked to do this task recurrently. They were frequently asked to monitor people in restraint chairs. And, you know, their own policies reflect how obvious the risks were, right? Because the policies themselves know that someone could experience medical problems in the chair. But every 10 minutes is fine. Is the problem that they're not required to go in the room? Is that your point? I think the problem is they're not told at all what to do when they see someone potentially unresponsive. They're not told when to go in. They're not told how to know if someone from the outside—I see my time is up. May I finish answering? They're not told, you know, what to do when they think someone is asleep or something worse. They're not told, you know, when to go in. Other officers here did testify that they sometimes went in or that they would look for someone's chest rising. These officers were not trained to do either of those things or how to otherwise determine when someone needed additional help. Okay. Thanks to all three of you for your helpful briefs and for answering our questions, which we always appreciate. And the case will be submitted.